**OPDYKE et v. SECURITY SAVINGS & LOAN COMPANY et.**
**JERGER v. SECURITY SAVINGS & LOAN CO.**
**SABIN v. SECURITY SAVINGS & LOAN CO.**
**MINSHALL v SECURITY SAVINGS & LOAN CO.**
**HUTCHINSON v. SECURITY SAVINGS & LOAN CO.**

Common Pleas Court, Cuyahoga County.

Nos. 607237, 607315, 607529, 610603, 610256. Decided June 27, 1950.

214

Appearances in Case No. 607237:
Einar G. Carlson, Samuel Sonenfield, for Pennell, Carlson & Rees, Cleveland, for plaintiffs.
John T. Scott, Irvin W. Stillinger, for M. B. and H. H. Johnson, Cleveland, for defendants.
Herbert S. Duffy, Atty. Genl., Nelson Lancione, Asst. Atty. Genl., for defendant, Superintendent of Building and Loan Associations of the State of Ohio.
Shocknessy, Summers & Denton, Columbus, for The Ohio Savings and Loan League, amicus curiae.

Appearances in Case No. 607315:
Lockwood Thompson, Cleveland, for plaintiff.
John T. Scott, Irvin W. Stillinger, for M. B. and H. H. Johnson, Cleveland, for defendant.

Appearances in Case No. 607529:
Lockwood Thompson, Cleveland, for plaintiff.
John T. Scott, Irvin W. Stillinger, for M. B. and H. H. Johnson, Cleveland, for defendant.

Appearances in Case No. 610603:
William E. Minshall, Jr., for William E. Minshall, Cleveland, for plaintiffs.
John T. Scott, Irvin W. Stillinger, for M. B. and H. H. Johnson, Cleveland, for defendant.

Appearances in Case No. 610256:
Lockwood Thompson, Cleveland, for plaintiff.
John T. Scott, Irvin W. Stillinger, for M. B. and H. H. Johnson, Cleveland, for defendant.

## OPINION

By KOVACHY, J.

The Security Savings & Loan Company was organized in 1916 as a building and loan association under the corporation laws of Ohio for the purpose of "raising money to make loans to its members and others, and generally the doing of all things and the transaction of all business authorized by the laws of Ohio to be done and transacted by building and loan associations." Its principal place of business is located at 1200 Huron Road, Cleveland, Ohio. The other named defendants, with the exception of Benson M. Smith, Superintendent of Building and Loan Associations of the State of Ohio, are directors and officers of the corporation.

On August 8, 1949, at a special meeting called for the purpose a Resolution was adopted by the stockholders to convert The Security Savings & Loan Company into a Federal savings and loan association pursuant to and in accordance with the provisions of §9660-1 and §9660-2 GC.

George F. Opdyke and Frank Schulte, partners, doing business as Ledogar-Horner Company and George F. Opdyke, individually, bring their action in case No. 607237 as Stockholders of The Security Savings & Loan Company and set up three causes of action in an amended petition. In the First Cause of Action they claim:

(a) That the proposed plan of conversion is inequitable as far as present stockholders are concerned;

(b) That the actions of the defendants in their promotion of the plan were both actually and constructively fraudulent;

(c) That the corporate action taken by Security in adopting the plan was illegal; and pray

"that the defendants and each of them be permanently restrained and enjoined from carrying out the terms and pro-

visions of the Resolution and Plan of Conversion purporting to have been adopted at the·said meeting."

In the Second Cause of Action they say:
"that they did not vote in favor of the aforesaid Resolution and Plan of Conversion at the said special meeting of shareholders held on August 8, 1949,"

and have complied with all requirements set out in §8623-72 GC of the General Corporation Act of Ohio in demanding the Fair Cash Value of $455.19 per share for the stock owned by them. They further aver that the company within the time specified and in compliance with said section refused the aforementioned demands and

"offered to pay plaintiffs the sum of $135.00 per share, subject to it being determined by a court of competent jurisdiction * * * that plaintiffs were entitled to be paid the Fair Cash Value of their said shares."

Plaintiffs did not agree to accept the Company's offer and ask, in the alternate, that if relief be denied them on their First Cause of Action that

"this court proceed to determine in a manner specified in §8623-72 GC, the Fair Cash Value, as of August 7th, 1949, of each of the shares of the permanent capital stock owned by them and each of them * * *."

In the Third Cause of Action they again plead in the alternative and say that if relief is denied them in the First and Second Causes of Action.

"the plan of conversion and §9660-2 GC are unconstitutional in that they authorize and permit the taking of plaintiffs' property without due process of law and are violative of the 5th amendment to the Constitution of the United States and **Article 1 Section 16 of the Constitution of the State of Ohio.**"

Elta H. Jerger, in Case No. 607315; Orrin C. Sabin, in Case No. 607529; Charles T. Minshall, et al., in Case No. 610603, and S. Chester Hutchinson, in Case No. 610256, are plaintiffs and stockholders of The Security Savings & Loan Company who did not vote in favor of the Plan of Conversion at the special meeting of the stockholders called for that purpose and held on August 8, 1949, and aver compliance with all the requirements set up in §8623-23 GC in demanding a Fair Cash Value

of $455.19 for each share owned by them in The Security Savings & Loan Company which demand was refused in writing within the required 10 days by the defendant, The Security Savings & Loan Company. They further say that they believe that the Plan of Conversion or reorganization is unconstitutional and amounts to a taking of plaintiffs' property without due process of law under Federal law and under the laws of the State of Ohio, unless they are entitled to the rights of a dissenting stockholder granted under §693-1 and §8623-72 GC. They pray that this Court proceed to determine in the manner specified in §8623-72 GC, the Fair Cash Value, as of August 7th, 1949, of their respective shares of stock and render judgments to them accordingly and for such other and further relief in law or equity as they may be entitled to receive.

The George F. Opdyke Company, et al. case was tried separately. The Sabin and Jerger cases were consolidated as allowed under §8623-72 GC and tried jointly. The Minshall, et al. and Hutchinson cases, by Stipulation between all the parties concerned, were stayed and continued until final judgment on the Opdyke, Sabin and Jerger cases at which time judgments similar to final judgments in the Sabin and Jerger cases, with such variations, respectively, as may be required by the facts in each case, will be entered.

Briefs were filed by George Opdyke, et al; The Security Savings & Loan Company, et al; Elta H. Jerger and Orrin C. Sabin; and The Ohio Savings & Loan League, Amicus Curiae. Oral arguments were presented to the Court after all briefs had been submitted.

Hereafter in Case No. 607237, George Opdyke, et al. will be referred to as "plaintiffs"; The Security Savings & Loan Company, as "Security" and the officers and directors of "Security" as "defendants."

All emphasis throughout this Opinion is ours.

Benson M. Smith, Superintendent of the Building and Loan Associations of the State of Ohio, is a nominal defendant.

Security is owned by approximately 180 stockholders, holding 1826 shares in all. The officers and directors at the special meeting of August 8th, 1949, owned 22% or about 418-8/20's shares. The plaintiffs at that time owned 589.1 shares, 182 of which were in the name of Opdyke and 407.1 in the name of Opdyke and Schulte. In addition, they claim ownership of some 22 shares of the permanent capital stock of Security not transferred upon the books of the company. All shares have a par value of $100. The permanent stock and running stock as of the same date amounted to around $200,000. The deposits, however, amounted to $7,343,000. Deposits are insured by the Federal Deposit Insurance Corporation. This

Federal body requires a ratio of 25 to 1 as between deposits and stocks and 10 to 1 as to reserves and stocks. When this ratio is out of balance 20% of the earnings has to be put into the reserve before computing the interest on savings. This materially reduces the amount of money available to be paid as dividends to stockholders on their shares. In recent years the deposits were on the upgrade and as a result a substantial part of the earnings had to be allocated to reserves. Because of this situation dividends declared on the outstanding stock were only somewhat better than the rate of interest paid depositors (2½%). The market price of the stock as a result was depressed and sold under par except for a short period of time, a matter only of months, when shares were purchased in contemplation of conversion. These conditions, together with the payment of double liability in case of disaster, prompted the officers and directors to consider converting into a Federal loan association by which the shares of Security with a par value of $100 are converted into share accounts on the basis of $135 of share accounts in the Federal association for each share of par value of $100. The deposits of Security are also converted into share accounts of the Federal association on a dollar for dollar basis. These share accounts are then withdrawable and are to be insured by The Federal Savings and Loan Insurance Corporation up to the aggregate amount of $5,000 as to each owner of share accounts. They see other advantages to the Federal set-up; the right to borrow 50% of the aggregate of deposits from The Federal Home Loan Bank; (as a State institution it is allowed to borrow only 30% of its deposits and capital stock); public acceptance; ability to allow loans up to 80% of the appraised value of property; (75% as State institution); right to make loans up to $1500 at 6% interest without the requirement of three-fourths of one percent for F. H. A. insurance; (only 5% interest as state institution); elimination of the requirement and incidental expenses of two independent examinations by the State Superintendent of Building and Loan Companies and The Federal Home Loan Bank. (Security is a member of The Federal Home Loan Bank.) In general, they believe that the conversion of Security into a Federal savings and loan association "will improve the financial business structure and the competitive position of Security."

Pursuant to these considerations the Board of Directors, by unanimous vote, passed a Resolution on April 28th, 1949, directing the president and secretary to apply to The Federal Home Loan Bank for conversion into a Federal Savings and Loan Association. A part of the Resolution was the following:

"Be it further resolved that the proposed plan of conversion to be submitted for approval by said Home Loan Bank Board shall provide, among other things, for the conversion of the capital stock of The Security Savings and Loan Company into share accounts of the Federal savings and loan association, into which this Company shall be converted, on the following basis:

"The holders of shares of permanent stock of this Company shall be given share accounts of said Federal association at the rate of $135.00 of share accounts for each $100.00 of the par value of the shares of said permanent stock held by such holders."

Following the action taken a "Preliminary Application For Conversion Into A Federal Savings and Loan Association" was filed with the Federal Home Loan Bank Board in Washington, D. C., by the president and secretary on May 4, 1949, in which they incorporated a "Certified Copy of Resolution of Board of Directors of The Security Savings and Loan Company." With it they also filed the following statement:

"The Security Savings & Loan Co. Pro Forma Statement As Of April 29, 1949 Showing Conversion Of Stock At $135.00 ·Per Share.

**Assets**

| | |
|---|---:|
| Cash on Hand and in Banks | $ 948,018.32 |
| Federal Home Loan Bank Stock | 60,000.00 |
| U. S. Bonds and Certificates | 710,000.00 |
| War Stamps | 84.50 |
| Mortgage Loans— | |
|     Regular | 5,201,736.68 |
|     F. H. A. | 150,838.03 |
|     G. I. | 672,462.95 |
| F. H. A. Title I loans | 526,120.21 |
| Land Contracts | 3,643.70 |
| Passbook Loans | 14,340.00 |
| Real Estate Owned | 1,081.76 |
| Premiums on Bonds Purchased | 73.57 |
| Deposits in Closed Banks | 52.96 |
| Unsecured Notes | 4.00 |
| War Bond Redemption | 7,256.45 |
| Accrued Interest on Bonds Purchased | 616.44 |
| Current Expenses | 45,507.32 |
| Total Assets | $8,341,836.89 |

## Liabilities

| | |
|---|---:|
| Christmas Clubs | $ 215,884.50 |
| Deposits | 7,110,562.12 |
| Deposits Escrow | 38,008.42 |
| Loans in Process | 383,537.15 |
| Advances from Borrowers | 34,545.80 |
| Unearned Interest—F. H. A. Title 1 | 25,952.14 |
| Contingent Profits | 131.53 |
| Reserve Fund | 328,995.00 |
| Reserve for Contingencies | 52.96 |
| Reserve for Taxes | 12.92 |
| Undivided Profits | 85,998.73 |
| Social Security Reserve | 173.44 |
| War Bonds Sold | 9,337.50 |
| Income Tax Reserve | 547.84 |
| Current Income | 108,096.84 |

Total Liabilities _____$8,341,836.89

On May 31, 1949, The Home Loan Bank Board sent Security a copy of a Resolution passed by it in answer to "Preliminary Application of Security":

"Home Loan Bank Board No. 1732
Date: May 27, 1949

"Resolved that the preliminary application of The Security Savings and Loan Company, Cleveland, Ohio, dated May 4, 1949, for conversion into a Federal savings and loan association is hereby approved, subject to the following condition:

"The adoption by the stockholders of said institution of a plan of conversion satisfactory to the Home Loan Bank Board, such plan of conversion to provide, among other things, that the subject institution's deposit accounts be converted to share accounts of the Federal association on the basis of book value, that its permanent stock be converted to share accounts of the Federal association on the basis of $135 for each $100 par value, and that its present Treasury stock of $17,450 be cancelled and the book profit thereon transferred to general reserves.

"Provided, however, that the foregoing condition shall have been complied with in a manner satisfactory to the Home Loan Bank Board not later than November 30, 1949, unless prior to such date a request to the said Board for an extension of such time limit shall have been received and granted.

"By the Home Loan Bank Board
(Signed) H. Caulsen
Assistant Secretary."

A Special meeting was then called of all the stockholders of Security on August 8, 1949, for the purpose of considering and voting upon a resolution to convert. The following Resolution was then voted upon:

"Be It Resolved, That The Security Savings and Loan Company, hereinbelow sometimes referred to as 'this institution,' convert itself into a Federal savings and loan association pursuant to and in accordance with the provisions of §9660-1 and §9660-2 GC; and

"Be It Resolved, That the following Plan of Conversion be, and the same hereby is, approved and agreed to by this institution:

"Plan of Conversion
"The Security Savings And Loan Company

"The provisions of the Plan of Conversion for converting The Security Savings and Loan Company, an Ohio corporation, hereinbelow referred to as the 'Ohio association,' into a Federal Savings and Loan association, hereinbelow referred to as the 'Federal association,' are as follows:

"1. All creditor obligations (other than deposit accounts) of the Ohio association existing as of the date on which conversion is completed shall continue as outstanding obligations of the converted Federal association.

"2. The Ohio association's deposit accounts shall be converted to share accounts of the Federal association on the basis of book value.

"3. Stock credits in respect of running stock of the Ohio association shall be converted into share accounts of the Federal association on the basis of $135 of share accounts for each $100 of par value of the shares or fractions of shares of said running stock represented by said stock credits.

"4. The issues and outstanding permanent stock of the Ohio association (excluding Treasury stock) shall be converted into share accounts of the Federal association on the basis of $135 of share accounts for each $100 of par value of said permanent stock.

"5. The 174-1/2 shares of permanent stock of the Ohio association, having an aggregate par value of $17,450, held as Treasury stock, shall be cancelled and the excess of the par value over the book value thereof shall be transferred to general reserves.

"6. The aggregate amount of share accounts issued by the Federal association plus the aggregate amount of creditor obligations continued shall not exceed the value of the assets of the converted Federal association

"and

"Be It Resolved, That this institution submit a petition to the Federal Home Loan Bank Board for a conversion into a Federal savings and loan association, under the name and style of Security Federal Savings and Loan Association of Cleveland, or such other name as to said Board may appear to be appropriate; that all costs in connection with such conversion be paid by the association; that the officers be directed to take all action and sign all papers and documents necessary and appropriate to the accomplishment of such a conversion; that if the application for conversion be approved, the outstanding shares of this institution be called in and new shares of the Federal association be issued therefor in accordance with the plan of conversion agreed to by us and submitted herewith; and that if for any reason any shareholders do not surrender their present holdings, equitable provision be made therefor by the reservation of shares in the Federal association:

"Be It Resolved, That all action taken by the directors and officers of this institution in connection with conversion into a Federal savings and loan association and obtaining insurance of accounts by the Federal Savings and Loan Insurance Corporation be, and the same hereby is, ratified, confirmed and adopted:

"Be It Resolved, That the directors and officers of this instituiton be, and they hereby are, authorized and directed to take any and all action which they may deem necessary or advisable in connection with the conversion and insurance of this institution in accordance with the intent of the foregoing resolutions, including the giving of written notice of the meeting of members to complete organization as a Federal savings and loan association, to all members who are entitled, under the charter of the Federal savings and loan association into which this association will be converted, to vote at such organization meeting."

The result of the vote on the Resolution was as follows:
1674.48 shares present in person or by proxy.
 80.00 shares were challenged by plaintiffs.
1594.48 shares present excluding challenged votes.
 913.88 shares voted in **favor** of adoption.
 680.60 shares voted **against** adoption.
The Constitution of Security contains this provision:

"No person shall be entitled to vote more than 20 shares held in his own right."

Applying this limitation to the vote the following results ensue:

1059.78 shares voted (excluding the 80 challenged shares which became 50 shares under the constitutional limitation).

612.18 shares voted in favor.

447.60 shares voted against.

57.76% of the total casting a vote at the meeting were in favor of the adoption of the Plan of Conversion.

Pursuant to the action of the stockholders at this meeting an "Application for Conversion Into a Federal Savings and Loan Association" signed by the president and secretary of Security was sent to the Federal Home Loan Bank Board, Washington, D. C., on August 15, 1949, two copies of financial statement of the Company as of July 30, 1949, was enclosed. On September 22, 1949 The Federal Home Loan Bank Board notified Security that the application for conversion had been granted and that a Federal charter in the form of Charter K prescribed by the Rules and Regulations for the Federal Savings and Loan System had been issued in the name of Security Federal Savings and Loan Association of Cleveland and forwarded to them. The Board of Directors thereupon, on October 4, 1949, passed a Resolution calling for a special meeting of the members of Security on October 26, 1949, to take all necessary actions to complete the Conversion of Security into the contemplated Federal Association.

Plaintiffs filed this action on October 3, 1949, with service on defendants on October 6, 1949, which proceedings prevented the convening of the above authorized meeting by the Directors and stayed all Proceedings with respect to Conversion, until further order of this Court.

Certain pertinent provisions of Charter K read, as follows:

"3. Objects and Powers.—The objects of the association are to promote thrift by providing a convenient and safe method for people to save and invest money and to provide for the sound and economical financing of homes. The statute, this charter, and rules and regulations * * * shall be construed in keeping with the best * * * practices of local mutual thrift and home financing institutions in the United States.

"4. Members—All holders of share accounts of the association and all borrowers therefrom shall be deemed and held to be members thereof. * * *, each holder of a share account shall be permitted to cast one vote for each $100, or fraction thereof, of the participation value of his share account. A borrowing member shall be permitted, as a borrower, to cast one vote, and to cast the number of votes to which he may

be entitled as the holder of a share account. No member, however, shall cast more than 50 votes. * * *"

"Directors and Officers—The association shall be under the direction of a board of directors of not less than 5 nor more than 15, as determined and elected by the members. Directors shall be elected by ballot from the membership of the association, * * *.

"9. Reserves, Undivided Profits, and Dividends.—* * * All holders of share accounts shall participate equally in dividends pro rata to the participation value of their share accounts; * * *. All holders of share accounts shall be entitled to equal distribution of net assets, pro rata to the value of their share accounts, in the event of voluntary or involuntary liquidation, dissolution, or winding up of the association."

Thus it is seen that the stockholders of Security in the Conversion become holders of share accounts in the Federal association which in turn partake of the attributes of both shares of stock and deposits.

Alphin v. Wade, 89 Arkansas, 357:

A share of stock is defined as:

"* * * a right to participate, in a certain proportion, in the immunities and benefits of the corporation; to vote in the choice of their officers, and the management of these concerns; to share in the dividends of profits; and to receive an aliquot part of the proceeds of the capital on winding up and terminating the active existence and operations of the corporations."

Plaintiffs say that the proposed Plan of Conversion is "inequitable as far as the rights of the present stockholders are concerned," because as of June 30, 1949, each share of stock had a book value of $372.95, which included capital of $100.00 per share, reserves of $178.55 per share, and undivided profits of $59.40 per share and that the price of $135.00 per share "is an arbitrary figure fixed by the Federal Home Loan Bank Board in order that the amount of capital assets to be transferred by the present corporation to the new association would be sufficient to satisfy the arbitrary requirements of that Board—and without any consideration whatsoever to the book value, capital assets, undivided profits, reserves, Fair Cash Value, or any other value." They introduced in evidence charts, graphs and statements depicting these factors as well as factors of earnings, dividends and depositors protection. They

also say that the stockholders in this conversion not only lose their undistributed profits, their interest in reserves and the earning power of the stock of Security which earned $26.78 per share in the first half of 1949 but their control as well since it drops from 100% to a mere 4% because of the host of depositors becoming holders of share accounts.

Furthermore, they question the so-called advantages claimed by Security as to enlarged borrowing power and less strict mortgage loan requirements and claim that the depreciation of reserves, smaller reserve requirements and freer control by directors of net earnings are a detriment rather than a benefit to sound banking practices. They then claim that

"the real fruits from the consummation of the Plan will be enjoyed by the present officers and Directors of Security who are virtually assured of perpetuation in office by the fact that they are no longer answerable to a small group of stockholders * * *"

and having freer control of undistributed profits can very easily divert them to the payment of higher salaries.

Plaintiffs also fail to see that any advantage will accrue to the company, to depositors or the public by the federalization of Security and say further that the company in its present status will continue to be "a sound and growing savings and loan company wholly acceptable to the general public" and suggest that the lack of balance between deposits and capital stock be remedied either by declaring stock dividends from undistributed profits or by reducing the interest rate on deposits which would stem their increase and permit higher dividends.

The defendants claim that under Chapter II of the Federal Savings and Loan System, Section 202.29 the plaintiffs had the right to complain to the Federal Home Loan Bank Board before resorting to the courts for relief as to their First Cause of Action, and that not having exhausted its administrative remedy can now have no relief in this court as to the same.

Pertinent parts of Section 202.29 read, as follows:

"Right of hearing—(a) Date, place, notice and rules of hearings.—
"* * *

"At any time after the filing of an application or petition to the Board by any person and before consideration thereof by the Board in accordance with these rules and regulations, any interested person (hereinafter referred to as a 'protestant')

may request a hearing provided such protestant shall simultaneously file with the Board specific objections to the granting of the application or petition. Upon receipt of written request for such hearing, the Board or the review committee of the Board will fix a date for such hearing not earlier than 10 days nor later than 30 days after the date of the resolution of the Board or the order of the review committee fixing such hearing date. Unless the Board shall otherwise determine, such hearings will be conducted by the review committee at the offices of the Board at Washington, D. C. The Board may fix some other place, convenient to the parties, for conducting such hearing, in which event such hearing shall be conducted at such place and upon such conditions as the Board may prescribe. If the Board fixes such hearing date and the place of such hearing, a certified copy of such resolution shall be forwarded to the applicants and to the protestants by the Secretary or an Assistant Secretary to the Board. If the review committee fixes the date and place of such hearing, a copy of an order signed by the chairman of the review committee shall be sent to the applicants and protestants by the Secretary or an Assistant Secretary to the Board.

\*         \*         \*         \*

"The Board may dispense with any hearing provided for by this section when, in its judgment, no need therefor exists."

The Secretary to the Home Loan Bank Board on November 17, 1949, certified with request to the same, as follows:

"I Further Certify that at the time of the adoption by the Home Loan Bank Board on September 21, 1949, of the said Resolution No. 2034, the Home Loan Bank Board had not received an application or petition for a hearing in connection with the application of The Security Savings and Loan Company, Cleveland, Ohio, for permission to convert to a Federal savings and loan association."

In the First Cause of Action the plaintiffs claim relief
(1) Because they say the Plan is inequitable
(2) because of fraud, and
(3) because the Plan of Conversion is illegal.
The Federal Home Loan Board having no equity powers could not have passed on the first claim. The third claim in the main calls for the clarification of the law generally as to the specific vote required in the conversion of a state corporation into a Federal association. This only a court of

law can do with any degree of finality. The court, therefore, comes to the conclusion that under the circumstances of this case, the plaintiffs have the right to appeal directly to a court of law despite the fact that they have not exhausted the administrative remedy allowed them.

42 American Jurisprudence, 582:

"The exhaustion doctrine operates where an administrative agency has authority to pass on **every question** raised by a party resorting to judicial relief, and enables the court to withhold its aid entirely until administrative remedies have been exhausted, and is inapplicable to defeat a right of election which a party may have between an administrative and judicial remedy."

42 American Jurisprudence, 699:

"The doctrine does not apply in relation to a question which, while properly determinable by an administrative tribunal, does not involve a question of fact, **but one of pure law,** is determinable apart from the exercise of administrative discretion, and the requisite uniformity of determination is attainable otherwise than by confining determination of the question to the administrative tribunal." **Doctrine of Primary Administrative Jurisdiction.**

In the early case of Trustees of Dartmouth College v. Woodward, 4 Wheat. (17 U. S.) 518, the Supreme Court of the United States established the doctrine that a charter granted by a state to a corporation was a contract between the state and the corporation, the obligations of which cannot be impaired by any alteration, amendment or repeal of such charter without the consent of the corporation unless the power so to do was expressly reserved by the state. Subsequently, most states by constitutional or statutory provision have reserved the power to alter, amend or repeal corporate powers granted in a charter.

Ohio did so in 1851 and its provisions, incorporated in the Constitution, under **Article XIII, Section 2,** reads as follows:

"Corporations may be formed under general laws; **and all such laws may, from time to time, be altered or repealed."**

Ohio adheres to the rule that the relationship of stockholders to the corporation is one of contract.

**Geiger, et al. v. Seeding Machine Co., et al., 124 Oh St, 222,** paragraph 3 of the syllabus:

"A stock certificate issued by a corporation is a contract between the corporation and the holders of certificates of all classes of stock."

A few states, notably New Jersey, adhere to the doctrine that the reserve power applies alone to the contract between the state and corporation but the majority of the states and the Supreme Court of the United States hold that its scope extends not only to the contract between the state and the corporation, but also to the contract between the corporation and its stockholders and the contract between the stockholders themselves.

32 Michigan Law Review, 749:

"* * * a majority of the state courts and the Supreme Court of the U. S. are opposed to the strict New Jersey view (that the contract relations between the stockholders inter se are not within the scope of the reserved power); they hold that the reserved power extends not only to the contract between the corporation and the state, but also to the contract existing between the stockholders themselves. * * * According to the majority view, all the elements of the contract between the shareholders with reference to their interest in the corporation and to its internal management may be altered by amendment to the charter, as being within the conditions upon which the state grants the privilege of corporate existence * * *."

The effect of the reserved power then is

"* * * to reserve to the legislature the power to make any alteration or amendment of a charter subject to it, which will not defeat or substantially impair the object of the grant, or any right vested under the grant, and which the legislature may deem necessary to carry into effect the purpose of the grant, or to protect the rights of the public or of the corporation, its stockholders or creditors, or to promote the due administration of its affairs. Looker v. Maynard, 179 U. S. 46 at page 52. Wright v. Minnesota Mutual Life Insurance Co., 193 U. S. 657; Polk v. Mutual Reserve Fund L. Association, 207 U. S. 310.

Ohio follows the majority rule.

Harbine, Jr., v. Dayton Malleable Iron Company, 61 Oh Ap, 1, par. 2 of syllabus:

"2. Although, at the time a shareholder purchases stock, the legislature has not provided by statute that the corporation's articles may be amended in certain respects, nevertheless under **Section 2, Article XIII of the Constitution,** the shareholder's contract is subject to such future legislation."

It therefore appears that the contract between the stockholder and the corporation at the inception of the relationship includes within its provisions not only the charter, by-laws and constitution of the corporation but also all applicable laws of the State then in existence or which may be enacted in the future.

Germer v. Gas & Oil Co., 60 W. Va. Reports, 153:

"The broad reservation to the legislature to 'Amend, alter or repeal' the provisions of the statute under which corporations operate are as though written into every charter issued thereunder, and every subscriber to the stock of any such corporation is charged with full knowledge of the provisions of the law then existing, under which the legislature might, at any time, amend, alter or repeal the provisions of the law which were so made a part of the charter, and such subscriber must be held to have given his consent that such change might at any time be made by the legislature."

Ontjes v. Bagley, et al., 250 North Western, 17, par. 1 of the syllabus: "Statutory or constitutional provisions of state in which corporation is organized constitute part of its corporate charter, and both taken together form contract between corporation and its stockholders."

Jones v. Missouri Edison Electric Co., 144 Federal, 765, paragraph 1 of syllabus: "The relation of a stockholder to his corporation is one of contract in which the pertinent statutes and the state law are embodied."

Yoakam v. Providence Biltmore Hotel Co., et al., 34 Federal (2d) 533, paragraph 10 of the syllabus:

"Provisions of statute and of corporate certificate are constituent part of contract entered into between corporation and its stockholders."

**Kaifer, et al., v. Ohio Leather Co., 8 Abs, 343:**

"Stockholders in corporation own their holdings subject to constitutional provisions and are subject to legislation incident thereto."

Security claims the right to convert from a state savings and loan company into a federal savings and loan association pursuant to and in accordance with the provisions of §9660-1 and §9660-2 GC. These sections come under Title IX: Private Corporations; * * * Division IV: Building and Loan Associations; Chapter One Re-organization and Powers, §9643 to §9675 GC.

The last mentioned sections of the General Code of Ohio apply to building and loan associations and are a constituent part of the contract of the stockholders of Security.

**Wheatley, et al., v. The A. I. Root Company, et al.; 79 Oh Ap 93; 34 O. O. 478:**

"We hold that, inasmuch as amendments to general corporation laws become a part of the charter of a corporation as of the day of their promulgation, the provisions of §8623-14 (i), GC, became a part of the contract governing plaintiff's stock ownership as of the date it became effective."

Sec. 9647 GC, reads, as follows:

"Such corporation shall have all the powers set forth in the following sections of this chapter":

Thus the powers conferred upon Security by the legislature of Ohio to effectuate the conversion contemplated under §9660-1 GC, read as follows:

"* * * to do everything required of or authorized or permitted by the provisions of said acts and laws (Act of Congress of the United States, entitled 'An Act to create Federal Home Loan Banks, to provide for supervision thereof, and for other purposes,' approved July 22, 1932, and amendments thereto, including the Home Owner's Loan Act of 1933, or all supplements to said acts and laws of the United States enacted in substitution therefor), to members of a Federal Home Loan Bank created therein, including * * * conversion into a Federal savings and loan association, as authorized by and pursuant to any rules and regulations prescribed or which may hereafter be prescribed by virtue of and in accordance with said acts and laws; but such conversion shall be made only in the manner and subject to the conditions provided in §9660-2 GC."

The Legislature of Ohio was faced with a difficult task in writing this section because it had to confer all-inclusive

power upon the state corporations in order to enable it to meet the exacting requirements of the Federal law to effectuate a conversion.

**Chapter II, Title 24, of the Code of Federal Regulations** with amendments to June 30, 1947, paragraph 202.17 contains the following language:

"The applicant **must comply with** all state laws, if any, which expressly prescribe procedure for conversion, **Federal laws, and their rules and regulations.**"

It appears to this court that the language of §9660-1 GC adequately and fully empowers state corporations to meet this demand of Federal law.

**Sec. 9660-2 GC** reads thusly:

"To convert itself into a federal savings and loan association as authorized by the acts of congress mentioned and described in §9660-1 GC, and pursuant to the rules and regulations prescribed by and in accordance with said acts and laws, by proceeding as follows, and not otherwise:

"1. The board of directors shall adopt a resolution fixing the time and place of holding a special meeting of all the stockholders of every class, and shall cause not less than twenty days' written notice of such time and place and of the purpose of such meeting to be given to each such stockholder, either personally or by mail directed to him at his last known post office address as appears upon the records of the corporation.

"2. At such meeting a resolution to convert as aforesaid shall be adopted as provided in the home owner's loan act of 1933 and amendments thereto.

"3. Within one week after the date of such stockholders' meeting, copies of the resolution of the board of directors and the minutes of such meeting of stockholders, together with a statement showing the giving of notice as herein required, all verified by an affidavit of the president or a vice-president, and of the secretary or an assistant secretary of the association, shall be filed in the office of the superintendent of building and loan associations.

"4. Within eight months after the date of such stockholders' meeting, there shall be filed in the office of the superintendent:

"(a) Two copies of the federal savings and loan association charter issued to the federal savings and loan association into which the conversion is to be made, each of which shall

be duly certified by the authority issuing the same; together with a payment of five dollars; and, unless such charter shall itself provide therefor,

"(b) A copy of a resolution of the board of directors, or other duly authorized agency, of such federal savings and loan association, verified by affidavit of the proper custodian of its records, showing the assumption by such federal savings and loan association of all debts and liabilities of the converting domestic associations as of the date on which conversion shall be completed, and the manner in which each class of the same will be discharged or adjusted by such federal savings and loan association.

"The superintendent shall have the power to extend the time for filing of any document hereby required to be filed in his office.

"When the foregoing requirements have been fully complied with the superintendent shall within ten days thereafter cause one copy of the federal savings and loan association charter, so filed with him, with his approval endorsed thereon, to be filed in the office of the secretary of state, and for that purpose shall transmit the payment of five dollars to the secretary of state. Until such copy is so filed in the office of the secretary of state, such association shall continue to have and exercise its corporate powers under its charter and in accordance with its constitution and by-laws, and be subject in all respects to the laws of this state and the power and authority of the superintendent therein, and its property and assets shall remain vested in it; but on the day and hour of such filing, such association shall be deemed to have been converted into the federal savings and loan association evidenced by such charter, and thereupon:

"(1) The corporate powers of the association under the laws of this state shall cease to exist and its constitution and by-laws shall cease to be in force.

"(2) Its articles of incorporation shall be deemed to have been cancelled and annulled.

"(3) All its property and assets including all of its right, title and interest in and to all property of whatsoever kind, whether real, personal or mixed, and things in action, and every right, privilege and interest then existing, belonging or pertaining to it, or which would inure to it, shall immediately without any conveyance or transfer, and without any further act or deed, be vested in and become the property of the successor federal savings and loan association which shall have, hold and enjoy the same in its own right, as fully and to the same extent as the same was possessed, held and enjoyed by

the association; provided, however, that all liens upon the property and assets of such association, existing at the time of conversion, shall be preserved unimpaired, limited in lien to the property or assets then affected thereby; and nothing herein shall be held or construed to deprive any person, firm or corporation of any substantive right theretofore existing against such association, nor of the right to enforce the same by appropriate proceedings against the property and assets transferred by operation of this paragraph, in the event and to the extent that such substantive right shall not be satisfied or adjusted by the successor federal savings and loan association in accordance with its charter or the resolution of assumption hereinbefore required.

"(4) The power and authority of the superintendent of building and loan associations over and with respect to such association, its property and assets, shall terminate.

"Any action or proceeding pending by or against such association at the time of its conversion may be prosecuted to judgment, with right of review or error or appeal as in other cases, as if such conversion had not taken place, or the successor federal association may be substituted for such association.

"A copy of the federal savings and loan association charter as filed in the office of the secretary of state, certified by the secretary of state under the seal of his office and showing the day and hour of filing, shall be recorded in the office of the recorder of the county in which the association had its principal office or place of business at the time of conversion, and in each county in the state in which such association owned real estate at the time of its conversion, for which recording the recorder shall charge the same fees as for the recording of deeds."

This section of the General Code sets out in full and complete detail all the steps to be taken to convert a state savings and loan corporation into a federal savings and loan association.

It explains the hour of demise of the Ohio corporation and the legal effect upon the corporate powers, the superintendent of building and loan associations, and the articles of incorporation. At that moment also its property and interests of whatever kind become vested in the successor federal association "without any conveyance or transfer, and without any further act or deed." All liens against the Ohio corporation at the time of conversion are preserved against the Federal association.

All rights as to pending actions and existing substantive rights of action are preserved and minor details necessary for the final consummation of the conversion established.

By the conferring of such plenary powers, the delineation in such exacting language of every step to be taken for conversion and the explanation in such conclusive language of the legal effect and legal status of every conceivable phase of the subject matter under consideration, the legislature obviously intended that these sections of the General Code by themselves completely accomplish and fulfill the objectives sought by this legislation. By the reading of them it is clear that there is no necessity to look to any other section of the General Code for authorization or guidance to effectuate the conversion of an Ohio savings and loan corporation into a Federal savings and loan association or to determine the rights, privileges and obligations of any one in any way concerned with or affected by a conversion.

Plaintiffs claim that by the conversion of Security a dissolution occurs, a reorganization takes place and a sale of its assets is effected, and that consequently the respective statutes dealing with these matters apply and should be invoked. Under Ohio law that is not so. Dissolution means the entire demise of the corporation—its ceasing to continue in business and distribution of net assets among stockholders; reorganization means, revamping of the corporation, but its continuation as the same corporation. Sales of assets means the divorcing of assets from further use of them by the corporation. Conversion, on the other hand, imports a change or transformation into another and entirely new entity with all of its assets giving the life blood to the new corporation in the furtherance of the same business as originally undertaken by the corporation, however under a new name and under new laws and regulations.

Plaintiffs say that the language in **paragraph 2 of §9660-2 GC.** "* * * a resolution * * * shall be adopted as provided in the home owners' loan act of 1933 and amendments thereto" refers generally to procedural matters and leaves the percentage vote to be controlled to other sections of the General Code dealing with the particular phases of corporation activity occuring in this transaction. This claim is untenable. What other sections of the Ohio General Code could be referred to? Security is effecting a conversion in pursuance to and in accordance with the sections of the General Code mentioned above. It does not have in mind a dissolution, reorganization, or a sale of assets. The law pertaining to those matters can have no application to the vote required in the proposition here under consideration.

**Paragraph 202.23 of Chapter II Federal Savings and Loan System**, captioned "Formal Application for Conversion, (a) shareholders affected on conversion * * *" reads in part:

"* * * applicant shall proceed forthwith to obtain vote of its shareholders required by state law, if any, which expressly authorizes the conversion, or in the obsence of such a state law, the vote of the shareholders required by Section V (i) of **Home Owner's Loan Act of 1933, as amended.**"

The "State law which expressly authorizes the conversion" is §9660-2 GC and the only part of it which can be construed as indicating the vote of its shareholders required for the conversion is the expression "home owner's loan act of 1933 and amendments" which language significantly is the same word for word which appears in the Federal law. Logic dictates that the vote therein set forth is the vote the legislature intended.

The **Home Owner's Loan Act of 1933, as amended,** reads that

"* * * any members of a federal home loan bank may convert * * * upon a vote of 51 per centum or more of the votes cast * * *."

It is of more than passing significance to note that §9660-3 (a) GC having to do with "conversion or reorganization of federal associations into state associations" says

"the adoption of such plan shall require the rate of **fifty-one percent or more of the votes cast** by the members present in person or by proxy at said meeting"

when the Federal law reads:

"In no event upon a vote of **less than 51 percentum** of all the votes cast at such meeting."

There is no question in this case but that at least 51% of all votes cast at the meeting held by Security on August 8, 1949, for the purpose of passing on the matter of conversion were in favor of the Plan without including in the consideration the 80 votes challenged by the plaintiffs so that it will serve no useful purpose to rule on the mentioned challenged votes. There is also no question but what all the necessary proceedings required by Security to take to effectuate its conversion into a Federal savings and loan association have been taken in strict compliance with all the provisions of law

with the exception of the convening of a final special meeting of all of its members for the purpose of obtaining authorization to take the last necessary technical steps to perfect and complete the conversion of Security into the Federal body.

Is the proposed plan inequitable as far as stockholders are concerned because the value fixed for a share of stock is not based on the book value, which is estimated from capital assets, reserves, undivided profits and earnings, rather than on the value allowable from the company's assets after providing for the reserves and undivided profits required by the rules and regulations of the Federal Home Loan Bank Board to permit the concern to continue as a going business after conversion into the Federal association?

In advancing the position that it is inequitable plaintiffs lose sight of the fact that Security is a banking concern demanding for its existence the depositing of large sums of monies which must have protection through allocating the major part of its net earnings to reserves adequate for the purpose. They also fail to realize that under the law stockholders have no property rights in reserve and undivided profits of a corporation.

13 American Jurisprudence, 465:

"The earnings and profits of a corporation remain the property of the corporation until severed from corporate assets and distributed as dividends. Until that time stockholders have no property interest therein."

Boardman, et al. v. Lake Shore and Michigan Southern Railway, 84 N. Y., 157:

"A shareholder in a corporation is not entitled to any of the property or profits until a division has been made or a dividend declared."

In **Lamb v. Lehman, 110 Oh St, 66,** Chief Justice Marshall has the following to say:

"The authorities are quite harmonious upon the proposition that the earnings and profits of a private corporation are the property of the corporation free from all claims of stockholders unless and until distributed as dividends."

The conversion price of $135 per share for the stock of Security was proposed and approved by the Board of Directors by unanimous vote. They then submitted the same in its

Plan of Conversion to the Federal Home Loan Bank Board who approved it subject to approval of it by the stockholders. This Board consists of:

**"Federal Home Loan Bank Act, Title 12, Section 1437.**

"* * * five citizens of the United States appointed by the President of the United States by and with the advice and consent of the Senate. Not more than three members of the board shall be members of the same political party. Each member shall devote his entire time to the business of the board. * * * Each of the members of the board shall receive a salary at the rate of $10,000 per annum: * * * The Board shall supervise the Federal Home Loan Banks created by this chapter, and shall have power to adopt, amend, and require the observance of such rules, regulations, and orders as shall be necessary from time to time for carrying out the purposes of the provisions of this chapter."

Before acting on the matter the Board of Directors conferred with the Federal Home Loan Bank Board and tried to obtain a valuation of $150.00. The board, basing it upon a requirement of a reserve fund of 5% of total assets and an undivided profits fund of 2% of total assets to assure the continuance in business of the Federal association on a safe and sound foundation, indicated that a valuation of $135 only was allowable. No one claims that these requirements are unreasonable to enable Security to continue as a going concern. In fact, plaintiffs make the point that the Plan of Conversion reduces the protection to depositors. The price of $135 thus is based on the business judgments of an experienced and well seasoned Board of Directors, a Federal Board of carefully selected individuals highly qualified for their office and politically balanced, and the majority of the stockholders acting entirely from self interest. Such complete circumspection in determining the fair and reasonable value of a share of stock on the part of all under the circumstances of conversion who are concerned about the matter should satisfy the most fastidious and allay the apprehensions of any who might be wary of a square deal in the matter. Certainly the procedures set out by law with respect to it have been fully complied with and the price, when one considers the history of stock sales (excepting sales in contemplation of conversion), the dividends earned, the availability of $135 in cash at any time, the insurance feature and the elimination of double liability in case of disaster, does not appear to be unfair or unreasonable to this Court.

Allaun v. Consolidated Oil Co., et al., 16 Delaware Chancery Reports, page 319:

"In suit by a minority stockholder to enjoin sale of corporation assets, consisting solely of entirely outstanding stock issue of operating oil company, on ground that proposed price is grossly inadequate, evidence held insufficient to overcome presumption existing in favor of fairness of price which responsible authorities in selling companies had determined on."

Ballentine on Corporations, page 673:

"But when it comes to reviewing the fairness and adequacy of the price or consideration the courts feel themselves controlled by the policy of giving directors and majority shareholders a wide business discretion in matters of contract and corporate management."

Spencer v. Railroad, 137 North Carolina, 107, paragraph 3 of the syllabus:

"Where the legislature provides a method for assessing the value of stock owned by persons who do not desire to take stock in a consolidated company in lieu thereof, the mode prescribed is exclusive and must be followed."

Hale v. Cheshire Railroad, 161 Mass. 443:

"Where the consolidation of two railroad companies has been authorized by legislative authority, a dissenting stockholder cannot maintain a claim for better terms than those given by the vote of consolidation, if such vote was by a majority of the stockholders of each company acting in good faith and within such legislative authority."

In any event the plaintiffs have failed to prove that the price of $135 a share for Security stock is inequitable and under the circumstances the Court has no right to interfere with respect to it.

The Court, moreover, is not impressed with the claim that the directors and officers can perpetuate themselves in office upon conversion because of a great increase in shareholders (share accounts). They are still subject to election to office as well as ouster from office if the majority so decree.

Plaintiffs and defendants are very much at odds as to whether this conversion is desirable from a business stand-

point. The defendant Board of Directors and officers being in the business are highly qualified to pass judgment on the matter. The plaintiffs being in the investment business are highly qualified to pass on certain phases of it. However, the majority of the stockholders, in the exercise of their business judgment with respect to it voted to consummate the plan. They are the persons most directly to be affected by it and courts are loathe to substitute their judgment as to the policy and the best course that a business enterprise should follow for the judgment of men engaged in the business and having a personal interest in it as well as a vital concern about it.

Davis, et al v. Louisville, Georgia & Electric Company, 16 Delaware Chancery Reports, 158, paragraph 4 of syllabus:

"Courts will not resolve questions of policy and business management for corporations, and on such questions it is presumed that the judgment of the directors was formed in good faith, and was designed to promote the best interests of the corporation, and their judgment is final, in absence of fraud."

"Where majority of stockholders speak for corporation on extraordinary matters of policy and management, presumption exists that their decision was made in good faith for benefit of corporation."

Ballentine on Corporations, page 673:

"The courts hesitate to substitute their judgment for that of the parties concerned in matters of business. Except where the corporate representatives act under the bias of adverse interest, it is commonly said that there is a strong presumption of fairness and good faith on the part of the majority and the burden of proof is upon dissenting shareholders to overthrow this by evidence of unfairness or inadequacy of price so gross as to amount to fraud or constructive fraud."

The plaintiffs acquired their stock subject to the possibility of Security invoking §9660-1 and §9660-2 GC. That was their contract. Their status as stockholders was always subject to the violent changes therein contemplated. So long as the provisions of these acts are faithfully adhered to, they are in no way discriminated against and no stockholders are given preference over them they cannot be heard to complain even though they voted against the Plan, are thoroughly dissatisfied with the

value set for the stock and the proceedings contemplated, and question the wisdom of the Plan of Conversion from a business standpoint.

7 Rulings Case Law, 166:

"The consolidation of one corporation with another is a fundamental change in the purposes of the constituent corporations; and it is a general principle controlling consolidation that such action must receive the assent of every stockholder in the consolidating bodies, **unless the power to consolidate has been conferred by legislation that may be read into the contract of incorporation.**"

Durfee v. Old Colony and Fall River Railroad, et al. 87 Mass. Reports, 230, paragraph one of the syllabus:

"A stockholder in a corporation, the charter of which, * * * is subject to alteration, amendment or repeal, at the pleasure of the legislature, cannot maintain a bill in equity to restrain the corporation from engaging in a new enterprise, in addition to that contemplated by the charter, but of the same kind, if it is sanctioned by an express legislative grant, and by a vote of the majority of the stockholders."

Ballentine on Corporations, page 653, Section 273:

"Most modern statutes adopt the policy of conferring on corporations, acting by the directors and a specified majority, almost unrestricted powers of amendment of share contracts."

**Kaifer, et al v. Ohio Leather Co. et al. 8 Abs, 343, paragraphs 1 and 2 of syllabus:**

"Stockholders in corporation own their holdings subject to constitutional provisions and are subject to legislation incident thereto."

"Stockholders hold their interest subject to the right of the legislature to enact legislation authorizing re-organization."

Plaintiffs also claim that the action of the defendants in their promotion of the Plan was both actually and constructively fraudulent:

(1) That 72-1/2 shares of stock were acquired in 1949 by individual directors without disclosing the contemplated plan for conversion.

(It appears to the Court that there is nothing wrong about individual directors buying up shares of stock, and it is dif-

ficult to understand how a director could properly disclose matters that were under consideration in directors meetings until definite action had been taken.

**10 O. Jur., 701:**

"Ordinarily, a director as an individual has the right to deal in the stock of the company which he represents and to buy and sell the same at his pleasure; he often is required to hold stock in order to be a director, and the fact that his purchase or holding is large is not objectionable, as the presumption will be that his interest in the welfare of the company will be somewhat in proportion to the amount of his stock."

Moreover, it is significant that not one of those who sold their stock to a director during this period appeared in court to complain. If none of them feel aggrieved how can the plaintiffs?)

(2) That notice to stockholders contained no information as to the book value of the stock, the undistributed profits available for stockholders or the amount of equity capital the stockholders were donating to the new association.

(The evidence discloses that the usual financial statements sent out by all savings and loan companies were sent out by Security to its stockholders semi-annually. This information together with the special information with respect to the Plan of Conversion should have been adequate to fully inform the stockholders of the significance to them of the plan of Conversion. However, the record is clear that the plaintiffs sent letters to the stockholders prior to the special meeting which gave them all of the information which they now claim the directors withheld.

(Plaintiffs' Ex. 35)

"Ledogar-Horner Company.

Investment Securities, Union Commerce Building, Cleveland, July 22, 1949.

"To The Shareholders Of The Security Savings & Loan Company:

"This letter has two purposes:

"The first, and most important, is to defeat the proposal to federalize The Security Savings & Loan Company by paying the shareholders approximately 35c on the dollar of book value.

"The second is to offer to pay $160.00 for each of your shares ($25.00) more per share than the Plan of Conversion

proposes.) This offer is conditioned only upon our ability to acquire at least 750 shares.

"Frank J. Schulte and George F. Opdyke, the partners of Ledogar-Horner Company, own 182 shares of Security stock—just 10% of the outstanding shares.

"We like the company, its corporate set up, and, generally speaking, its management. We like its record and the values it represents for its shareholders. We believe that Security Savings & Loan stock is an excellent investment for future income and price appreciation.

"Its book value—which we have every reason to believe is sound—is over $370.00 per share (assuming the cancellation of 172 shares of Treasury stock). The stock has earned an average over the past five years of more than $26.00 per share per year. Each share has increased in book value more than $135.00 in the past five and one-half years.

"This is the stock that your directors believe is a good conversion into a $135.00 account in a Federal savings and loan association.

"We think it is worth more.

"We believe it is to the interest of every one—depositors and shareholders alike—to defeat the proposal. We believe that our shares can be worth still more in the future simply by continuing the present method of operation and the present corporate form. Under the plan your shares can never exceed $135.00 in principal value.

"To show our sincerity and good faith, we have deposited with the Cleveland Trust Company, Corporate Trust Department, $120,000.00 to be used for the purchase of Security Savings & Loan Company stock at $160.00 per share. A letter of transmittal and a proxy form are enclosed. These documents and your certificate should be signed and mailed to Cleveland Trust Company in the attached envelope. As soon as 750 shares are deposited, payment will be made to you immediately and unconditionally. If more than 750 shares are deposited with the Cleveland Trust Company, we shall deposit additional funds to cover their purchase. If less than 750 shares are deposited we reserve the right to purchase the shares so deposited at $160.00 per share. Our offer is open until 2:00 P. M. Wednesday, August 3, 1949.

"Assuming you favor any plan to receive payment for your shares at this time, you have everything to gain and nothing to lose by depositing your shares. If we buy your shares you will receive $160 in cash; if we do not buy your shares you can still vote for the Plan of Conversion and if the plan is approved you can still take the account at the rate of $135.00 as offered by the plan

"If you prefer to retain your shares as they are, the enclosed proxy should be signed and mailed to the office of Ledogar-Horner Company, 1145 Union Commerce Building. It will supercede any proxy you may have already executed.

"We shall be glad to discuss this matter at our office or by telephone, SUperior 6100.

"Very truly yours,

(Signed) Frank J. Schulte

George F. Opdyke."

(Plaintiffs' Exhibit 36):

"Ledogar-Horner Company

Investment Securities Union Commerce Building, Cleveland, July 27, 1949.

"To The Shareholders Of The Security Savings & Loan Company:

"We want to clarify two things.

"It has been said that the proposed federal association is better for depositors.

"It is not.

"It offers a great deal less protection to depositors than our present company. The depositors' protection is reduced by more than 36%.

"We know of no sound reason for approving the conversion.

"It has been said that we plan the liquidation of The Security Savings & Loan Company.

"We Do Not.

"The Plan in Effect Does.

"The plan liquidates our stock company (and at an extremely low price to us stockholders). And it sets up a new mutual association in which we shareholders in effect become simply depositors.

"We want the continued operation of the company as it is.

"If you have sent in a proxy approving the plan, you have actually voted for the liquidation of your shares. If this is what you want, then acceptance of our offer of $160.00 per share will do two things for you:

"1. It will profit you $25.00 per share.

"2. It will save the company as it is for the majority of stockholders who like their present investment and want to keep as it is.

"Sincerely, Frank J. Schulte, Jr. and George F. Opdyke.

"P. S. We enclose a mimeographed copy of a letter we sent to each of the Directors. We have had no replies."

(Plaintiffs' Exhibit 36-A):
                    "Ledogar-Horner Company
Investment Securities Union Commerce Building, Cleveland
July 27, 1949.
"This is a copy of a letter sent to each of the Directors of
The Security Savings & Loan Company.
                                        July 25, 1949.
"Dear Sir:
"A copy of this letter is being addressed to each of the
directors of The Security Savings & Loan Company.
"After careful study we believe the Plan of converting our
company into a federal Savings and Loan Association does
these things:
"1. Reduces voting rights of your shareholders by 96%.
"2. Takes $235.00 of sound book value from each share.
"3. Eliminates substantially all participation by present
shareholders in future earnings resulting from further growth
of the company.
"4. Eliminates substantially all participation in current earn-
ings.
"5. Removes any possibility of future increase in market
value of present shares.
"6. Reduces depositor protection from 9-½% to 6%.
"We have tried to think of reasons for favoring the plan
of conversion. Perhaps one sound reason may be that a
considerable number of shareholders want to sell—presumably
for the best price obtainable.
"If this is so then, now that we have made our proposal
to pay $160.00 per share, (conditioned only upon our ability to
acquire 750 shares) which is so much morefavorable than the
payment provided by the plan of conversion, we believe you
should recommend its acceptance to all shareholders who wish
to sell.
"Sincerely, George F. Opdyke Frank J. Schulte, Jr."

Furthermore, there is no evidence whatever that any stock-
holder was misled or uninformed concerning any phase of
this proposition and it is certain that the plaintiffs were not.)
(3) That Mr. Klumph, the president, made misstatements
as to the nature of and reason for the conversion.
(These statements were made after the Plan had been acted
upon and so could not have had any effect upon the result
at the meeting.)
(4) That certain misstatements had the effect of lulling
some of the stockholders to sleep.
(While it is perhaps true that the statements referred to

by the plaintiffs were not complete on the subject any misapprehension on the part of any stockholder was completely dissipated by the letters and information given to them before the special meeting as indicated above.)

(5) That defendants' exhibits 28 and 29 misquoted the true state of affairs by claiming that the amount of $135 had the final authority of the federal government behind it.

(This statement, of course, was not accurate because the Federal Home Loan Bank Board had approved $135 as the value of a share of stock subject to its adoption by vote of the stockholders. However it now has such approval so that no one was misled to his dertiment.)

(6) That the interests of depositors were placed ahead of that of the stockholders.

(The Court finds nothing to sustain this claim.)

The record in this case does show a determined effort on the part of some of the officers and directors to acquire certificates of stock to be voted in favor of this Conversion at the special meeting but it is clear that such effort was made by each in his individual capacity. There is no evidence tending to show any concerted action on the part of the Board of Directors to acquire stock so that there is nothing in the record to warrant any finding that the Board did anything unfair or misleading to obtain the stock or the vote of any stockholder. Not a single person testified that he was deceived or misled by anything set forth by the defendants in the voting for the Plan. The claim of the plaintiffs as to actual or constructive fraud perpetrated by the directors and officers of this company to obtain a favorable vote on the proposition of conversion from a factual standpoint is without merit.

293 Federal Reporter, 811 Willson v. Waltham Watch Company, et al., paragraph 1 of syllabus:

"Concealment of material facts in a circular sent out by a committee of stockholders, inviting other stockholders to deposit their shares, with power to the committee to vote the same cannot be made the basis of a suit to restrain the committee from exercising such power by a stockholder who did not so deposit his stock."

See also Rosenbaum v. Rice, et al. 86 Appellate Division, 617; 83 N. Y. S. 494.

Second Cause Of Action.

In this cause of action the plaintiffs claim the right to the determination and payment of the Fair Cash Value of their stock under the authority of §8623-72 and §693-1 GC. It is conceded by all parties hereto that the procedures outlined in §8623-72 GC have been followed and all requirements set

forth therein complied with so that the only question involved for the adjudication of this cause of action is the question whether the plaintiffs have such appraisal rights under the facts and circumstances of this case and pursuant to the sections of the Code mentioned.

Sec. 8623-72 GC, in part, provides:

"Unless the articles otherwise provide, any dissenting shareholder, who shall not have voted in favor of the proposals herein mentioned and by the provision of any section of this act is entitled to relief when the articles of the corporation have been amended, and when all or substantially all of the property and assets of the corporation have been authorized to be sold, leased, exchanged, or otherwise disposed of, or when a consolidation or reorganization of the corporation has been authorized, shall be paid the fair cash value of his shares as of the day before the vote was taken authorizing any such action, * * *."

This section grants appraisal rights in the case when

"(1) articles of the corporation have been amended.
"(2) all or substantially all of the property assets of the corporation have been authorized to be sold, leased, exchanged or otherwise disposed of,
"(3) a consolidation or reorganization of the corporation has been authorized."

The Court has hereinbefore determined that the nature of the proceedings planned by Security has no pertinency to sections of the General Code dealing with these mentioned matters. Security contemplates a complete transformation of the corporation—lock, stock and barrel into an entirely new legal entity as enunciated by the legislature in §9660-1 and §9660-2 GC. No appraisal rights can accrue to plaintiffs on the basis of this part of §8623-72 GC.

Sec. 8623-72 GC also authorizes the determination and allowance of Fair Cash Value

"by the provision of any section of this act." (Secs. 8623-1 to 8623-138)

Conversion in this case is based squarely on §9660-1 and §9660-2 GC which sections the Court finds to be complete and all-inclusive in accomplishing its purpose requiring no im-

plementation from any other section of the Code. No appraisal rights can accrue to plaintiffs from this part of §8623-72 GC.

Sec. 693-1 GC deals with the reorganization of savings and loan associations. It contains a provision, which reads:

"All dissenting shareholders shall be entitled to relief in the manner and under the conditions provided in §8623-72 GC."

This section likewise can bring no benefaction to plaintiffs as far as appraisal rights are concerned. The legislature in its enunciation of corporate law has made "reorganization" and "conversion" different concepts with respect to their application to changes in Ohio corporations as hereinbefore explained.

Plaintiffs further assert that §9660-2 GC expressly provides for Fair Cash Value by the use of the following language:·

"* * * shall be held or construed to deprive any person, firm or corporation of any substantive right heretofore existing against such association";

and that Fair Cash Value is a substantive right which the stockholders of Security have by virtue of §693-1 GC and other sections of the General Code including §8623-72 GC. This it seems to the Court is not so. In the opinion of this Court this provision merely intends to preserve the rights of all claimants having judgments or rights of action against Security before conversion. The legislature in its opening sentence in §8623-72 GC says "unless the articles otherwise provide" which clearly indicates that it did not look upon Fair Cash Value to dissenting shareholders as something in the nature of a basic right. However, more persuasive than that is the fact that in every instance throughout the General Code wherein appraisal rights are intended to be given dissenting stockholders it is granted by express language and never by inference, implication or deduction.

Sec. 8623-15a, GC.

"If the reorganization is effected pursuant to this act alone, dissenting shareholders **shall be entitled** to relief in the manner and under the conditions, and **to the extent prescribed in** §8623-72 GC, in respect of, the particular action, if any, which, if taken separately, would have entitled them to dissent and demand relief under this act."

Sec. 8623-65 GC:

"Dissenting shareholders of any class, whether or not entitled to vote, shall be entitled to relief under the conditions, in the manner and to the extent provided in this act."

**Sec. 8623-67 GC:**

"Dissenting shareholders of any constituent domestic corporation, whether or not entitled to vote, shall, if substantially prejudiced by such merger or consolidation, be entitled to relief under the conditions, in the manner and to the extent provided in this act."

Sec. 8623-72 GC (Quoted above)

**Sec. 693-1 GC:**

"All dissenting shareholders shall be entitled to relief in the manner and under the conditions provided in §8623-72 GC. * * *"

**Sec. 710-86 GC:**

"Any shareholder of the transferror bank who shall deem himself aggrieved by reason of such transfer, shall be paid the Fair Cash Value of his shares * * *."

**Sec. 9546 GC.:**

"But a stockholder in either of the companies so consolidating who refuses to agree thereto, shall be entitled to receive for the stock by him owned its just market value at the time thereof, to be paid to him previous to such consolidation."

**Sec. 8810 GC.:**

"A stockholder who refuses his assent to such sale, lease, or aid by subscription, * * * shall be entitled to receive * * * the average market value of his stock. * * *."

**Sec. 9034 GC.:**

"A stockholder who refuses to convert his stock * * * shall be paid * * * either the full market value thereof * * * or damages, if any to him because of the proposed consolidation or merger, * * *."

Besides §8623-132 GC of the General Corporation Act provides that:

"When special provision is made in the General Code for the incorporation, organization, conduct or government of corporations formed for any specified purpose, **this act shall not apply, but the special provision shall govern unless it clearly appears that the special provision is cumulative.**"

"Special provisions" on which Security bases its claim herein —§9660-1 and §9660-2 GC—are complete and all-inclusive as shown above. No part of it can be designated as cumulative. It is therefore clear that no provision of the General Corporation Act need be invoked to consummate the conversion planned by Security. These sections do not provide for the determination of the Fair Cash Value for dissenting stockholders. None therefore can be allowed under the law of Ohio.

In Cases No. 607315 and No. 607529, plaintiffs Elta H. Jerger and Orrin C. Sabin, are stockholders of The Security Savings and Loan Company. Each dissented at the special meeting of August 8th, 1949, and has since complied with all the steps required under §8623-72 GC to perfect his demand for the determination of the Fair Cash Value of his respective shares of stock. They say that the Plan of Conversion in fact is "a reorganization or merger" and contemplates the dissolution of Security as an Ohio corporation, a transfer of its assets and the surrender and cancellation of its stock upon payment of $135, and enumerate 17 corporate structural changes which they claim this conversion in effect authorizes, each of which by express language of the General Corporation Act, or §693-1 GC allows appraisal rights. The plaintiffs in the Opdyke case stress the same proposition. It is manifest that if the defendant company were proceeding under any of the sections designated that appraisal rights would be in order. However, the defendant is not acting under any of the enumerated sections. It is not invoking certain sub-sections of the General Corporation Act and §693-1 GC and by separate and disjointed maneuvers attempting to effectuate a conversion by the application of such apparently pertinent parts of the Code. The Court repeats that they are proceeding pursuant to and in accordance with §9660-1 and 9660-2 GC which set out all the steps necessary to a consummation of conversion without the need to invoke any other section or sections of the General Code of Ohio. It seems to this Court that if the legislature had intended to provide appraisal rights in the sections of the law relating to conversion it would have done so in express language similar to that used in the corporal changes noted above, and that not having done so is conclusive proof

that it had no intention to attach appraisal rights to §9660-1 and §9660-2 GC.

II Atlantic (2) 337:

"It is for the Legisuature not for the court, to declare the public policy of the state; and it is not, therefore, the function of the court to graft an exception on the plain and positive terms of the statute."

Plaintiff further say that if the Ohio statutes fail to give relief under these circumstances that then the dormant common law rights of plaintiffs should be invoked and the conversion enjoined on the basis of equitable relief in lieu of dissenting stockholders' rights.

As determined in the Opdyke case plaintiffs here likewise have rights in the premises which are circumscribed by their contract with the defendant. That contract includes all pertinent legislative enactments so that their rights, if any, with respect to the allowance of the Fair Cash Value for their stock, must be found in the Sections of the Code which apply and which are the only sections on which the Security Savings and Loan Company base their prerogative to convert. Those sections enunciate the law which governs the rights of the parties involved in this Conversion. The rights of dissenting stockholders under them have not been contravened and this Court can see no grounds to invoke its equitable powers. To enjoin defendants under such circumstances would amount to judicial tyranny.

One of the maxims of equity is "Equity follows the law."

In Magniac, et al. v. Thomson, 15 Howard (U. S.) 281:

"Wherever the rights or the situation of parties are clearly defined and established by law, equity has no power to change or unsettle those rights or that situation, but in all such instances the maxim Equitas Sequitus Legum is strictly applicable."

In Rambo, et al. v. First State Bank of Argentine, 128 Pacific, 182, Syl. 2:

"Equity must follow the law in all cases in which the legislature has intervened and prescribed rules of law which govern the rights of the parties."

### Third Cause Of Action

The expression "plaintiffs" in the discussion hereunder includes the plaintiffs of the Opdyke case as well as the Jerger

and Sabin cases. All challenge the constitutionality of §9660-1 and §9660-2 GC, in the event the Court construes such sections in such a way as to deny them the Fair Cash Value for their stock, on the ground of the impairment of the obligation of contract (U. S. Constitution, Article I, Section 10; **Ohio Constitution, Article II, Section 28**) and of the deprivation of property without due process of law (U. S. Constitution, Amendment V and XIV, and **Ohio Constitution, Article I, Section 16**).

The Court has studied and considered all the authorities cited in the briefs relating to this subject and has come to the clear conclusion that §9660-1 and §9660-2 GC do not impair the obligations of Security's contract with the stockholders nor do they deprive the plaintiffs of property without due process of law.

The relationship of the stockholders to Security is one of contract. The charter of the corporation, its constitution and by-laws and all applicable provisions of law are a part of such contract as though written in and made a part thereof and under **Article XIII, Section 2 of the Constitution of Ohio,** the legislature is permitted to enact laws providing for structural changes and transformations of corporations so long as the principal purpose and object of the corporation is not departed from and vested property rights of stockholders are not affected or nullified.

Yoakam v. Providence Biltmore Hotel Co. et al., 34 Federal (2d) 533, paragraph 10 of syllabus:

"Provision of statute of corporate certificate are constituent part of contract entered into between corporation and its stockholders."

13 American Jurisprudence, 473:

"It has been held too, that whether the proposed change in the obligation of a corporation to its stockholders is sanctioned by the reserved power to amend or alter the corporate charter depends on whether the change affects vested rights of the stockholders as distinguished from preferential rights."

Looker v. Maynard, 179 U. S. 46, at page 52:

"The effect of such a provision, whether contained in an original act of incorporation, or in a constitution or general

law subject to which a charter is accepted, is, at the least, to reserve to the legislature the power to make any alteration or amendment of a charter subject to it, which will not defeat or substantially impair the object of the grant, or any right vested under the grant, * * *."

Cook on Stock and Stockholders, Section 501:

"An amendment under the reserved power cannot change the character of the original enterprise nor take away rights already acquired under the charter."

Schaffner v. Iron Co., 150 Oh St, 454, 38 O. O. 316, on page 461, Judge Matthias of our Supreme Court has the following to say:

"The corporation was fully authorized to amend its capital structure, with the limitation, however, that it was precluded from adopting any amendment of its charter which would impair vested rights of the preferred shareholders to receive their unpaid cumulative dividends. Such amendment would effect a retroactive application of the provisions of §8623-14 GC, and would constitute an impairment of the constitutional rights of such shareholders."

Under the Plan of Conversion the Board of Directors by unanimous vote proposed a price to be allowed a share of stock in the new association which the Federal Home Loan Bank Board approved subject to approval by the stockholders of Security. The stockholders then gave their approval. All of these steps were taken in strict compliance with the law. The plaintiffs when they became stockholders of Security under the law of Ohio in effect agreed that the procedure outlined by the statutes would be binding upon them since in contemplation of law these provisions of the law are a part of their contract with Security. These laws do not divest them of any vested property interest and provides for the determination of the value of their stock by qualified men in an orderly way including a vote on the part of the stockholders themselves. How then can they with good reason assert that the obligation of their contract has been impaired because another method for the determination of the value of their stock is not provided for when the provisions of the law they agreed to abide by have been complied with faithfully?

Hill, et al. v. St. Louis Coke and Iron Company, et al., 9 Federal Supplement, 69, paragraph 1 of the syllabus:

"Where requirements of statute and certificate of incorporation as to approval of sale of corporate assets by directors and by holders of certain majority of stock having voting power were fully satisfied, minority stockholders could claim relief only on ground of fraud."

Fletcher Cyclopedia Corporation (Permanent Edition). Volume 15, Section 7164:

"A dissenting stockholder cannot demand of the consolidated company payment in cash for his shares of stock, where the consolidation is a lawful one without regard to his consent, and in such case an action at law or a suit in equity will not lie for the recovery of the value of the stock, unless it is otherwise provided by statute, * * *."

**Kaifer, et al. v. Ohio Leather Company, et al., 8 Abs, 343, paragraphs 1 and 2 of syllabus:**

"Stockholders in corporation own their holdings subject to constitutional provisions and are subject to legislation incident thereto."

"Corporation has right to reorganize as provided in Constitution and Statutes of State. Stockholders hold their interest subject to the right of the Legislature to enact legislation authorizing reorganization."

Hale v. Cheshire Railroad Co. 161 Mass. 443:

"Where the consolidation of two railroad companies has been authorized by legislative authority, a dissenting stockholder cannot maintain a claim for better terms than those given by the vote of consolidation, if such vote was by a majority of the stockholders of each company acting in good faith and within such legislative authority."

Germer v. Gas & Oil Co. 60 W. Va. Reports, pages 153-154:

"The broad reservation to the legislature to 'Amend, alter or repeal' the provisions of the statute under which corporations operate are as though written into every charter issued thereunder, and every subscriber to the stock of any such corporation is charged with full knowledge of the provisions of the law then existing under which the legislature might at any time, amend, alter or repeal the provisions of the law which were so made a part of the charter, and such subscriber must

be held to have given his consent that such change might at any time be made by the legislature. **This being true, it cannot be claimed, with good reason, that by such action the legislature would be impairing the obligation of any contract the subscriber entered into when he became a stockholder.** 4 Thompson on Corporations, section 5408."

Plaintiffs also maintain that unless they be given the Fair Cash Value for their stock under §8623-72 GC the value of only $135 under the Plan of Conversion amounts to the taking of their property without due course of law.

The Court, in a search of corporate laws of the 48 states of the United States finds that 43 states have corporate laws giving the power to sell, exchange or lease property (Arizona, Iowa, Mississippi, Texas and Wyoming have no such provision of law); that all states with the exception of South Dakota give their corporations power to merge or consolidate; that only nine states allow "Fair Cash Value" for dissenting shareholders (Arkansas, Florida, Georgia, Louisiana, Michigan, Minnesota, Nevada, Ohio and Virginia); four states have "Fair Market Value" (California, Kentucky, New Jersey, New Mexico); one state has "Market Value" (Alabama); twelve states have "Fair Value" (Arizona, Illinois, Iowa, Maryland, Missouri, New Hampshire, North Carolina, Oklahoma, Oregon, Pennsylvania, Tennessee, Wisconsin); eleven states have "Value of the Stock" (Colorado, Connecticut, Delaware, Idaho, Indiana, Maine, Massachusetts, Nebraska, South Carolina, Washington, Wyoming); two states have "Full and Fair Value" (Kansas and Rhode Island); and seven states allow no appraisal rights at all to dissenting shareholders although they, Mississippi, excepted, grant power to sell, exchange or lease or merger or consolidate upon a specific vote of the stockholders (Mississippi, Montana, North Dakota, South Dakota, Texas, Utah and West Virginia).

It would seem from all above that the allowance of the Fair Cash Value for the stock of dissenting stockholders is not an absolute prerequisite for a valid, subsisting and constitutional law respecting their rights, in fundamental corporate changes, and that, accordingly §9660-1 and 9660-2 GC do not violate the constitutional rights of the plaintiffs and are constitutional.

**8 O. Jur., page 154:**

"It is a well-established canon of construction that every reasonable presumption be indulged in favor of the constitutionality of a statute. This principle has been variously expressed. For example, it has been asserted that the courts must resolve every reasonable doubt in favor of the validity of

an act; that it is their duty to construe statutes liberally, in order to save them from constitutional infirmities; and that every reasonable intendment is to be made in favor of the legislature in enacting laws."

Polk v. Mutual Reserve Fund Life Insurance of New York, 207 U. S. 310, paragraph 1 of syllabus:

"Where there is a reserved power in the Legislature to alter, amend or repeal charters a law permitting mutual life associations to reincorporate as regular life insurance companies is not unconstitutional as impairing the obligations of the contracts existing between such associations and their policyholders, or as depriving such policyholders of their property without due process of law."

Thomson, et al. v. Indiana Union Traction Co., 110 N. E. 121, paragraph 3 of syllabus:

"Secs. 5685-5691 GC, authorizing the consolidation of street railroad companies, does not violate Constitution, Article 1, Section 21, providing that no man's property shall be taken by law without just compensation * * * in that it permits the conversion of stock of dissenting minority stockholders without provision for appraisal and payment of its value."

The purchaser of stock in a corporation knows that its value in the future is uncertain. The corporation may fail and he get nothing or much less than the purchase price for it. The laws under which the corporation was formed may be changed or repealed and the value of his stock greatly affected. Moreover, its value fluctuates as the business of the corporation or even that of the country prospers or wanes. In other words his stock does not represent any vested right as far as its value is concerned unless his contract with the corporation so provides.

The plaintiffs herein have no vested rights concerning the value of their stock. Their contract with the corporation with respect to their stock is subject to amendment or change by the enactment of law or by a specific vote of the stockholders as declared by law or the constitution of the corporation. The price established for their stock under the Plan of Conversion was strictly in accordance with the mandate of law. It was likewise in accordance with their contract with the corporation and legally binding upon them.

Corporations operate as a living organism through the men who direct and manage its affairs. These men need freedom of movement in deciding and carrying out policies with respect to their business and fundamental changes with respect to the structure of their corporations in order to be in a position to meet the competition of rival organizations and the vicissitudes of fortune as they come their way in the ebb and flow of economic life. Minority stockholders, therefore, should not have the power to thwart their honest efforts to effectuate changes which they believe are for the best interests of their company and all parties concerned.

Such powers, the Court feels, the minority stockholders in this instance do not have.

There is no sound reason why corporate laws should not keep abreast of the times and give to corporations the fluidity of action necessary to meet successfully the day by day competition of business life and to grapple effectively with the ever-changing and varying conditions of the economic world.

This is what the Court believes the legislature of Ohio intended in the laws herein directly involved and this is what the Court decides in these cases.

For the reasons hereinabove stated the Court finds for the defendants on all three causes of action in Case No. 607237 and dismisses the Amended Petition of plaintiffs at their costs; for the defendant in Case No. 607317, and for the defendant in Case No. 607529, and in each case dismisses the petition of the plaintiff at his costs.

Entries in Cases Nos. 610603 and 610256 are stayed until the further order of the Court.

A Journal Entry may be drawn accordingly.